

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| DENNIS R. DI RICCO, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | WD86327 |
| | ) | (consolidated with WD86329 |
| MISSOURI COMMISSIONER OF | ) | and WD86330) |
| SECURITIES, et al., | ) | |
| | ) | Filed: July 9, 2024 |
| Respondents. | ) | |

### Appeal from the Circuit Court of Cole County
### The Honorable Jon E. Beetem, Judge

### Before Division One: Lisa White Hardwick, P.J., and
### Alok Ahuja and Anthony Rex Gabbert, JJ.

The Missouri Commissioner of Securities found Golden Genesis, Inc., Thomas Casey, and Dennis Di Ricco liable for violations of the Missouri Securities Act of 2003, §§ 409.1-101 to 409.7-703.[1] The circuit court upheld the Commissioner's order. Golden Genesis, Casey, and Di Ricco appeal. They argue that the Commissioner lacked personal jurisdiction over them. The appellants also argue that the promissory notes which investors executed did not constitute "securities" subject to the Commissioner's regulatory jurisdiction. We hold that the Comissioner lacked personal jurisdiction over Di Ricco, and accordingly

---

[1] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated through the 2023 Cumulative Supplement.

reverse the Commissioner's order as to him. The order is affirmed with respect to Golden Genesis and Casey.

## Factual Background

Golden Genesis was formed in March 2016 and incorporated in the State of Nevada. Golden Genesis was a start-up company whose objective was to develop plasma donation centers in Texas under the name "NuPlasma." Golden Genesis contemplated that the NuPlasma centers would collect plasma samples from young adult donors, for use in the treatment of age-related illnesses like Parkinson's and Alzheimer's diseases.

This proceeding concerns loans extended to Golden Genesis by Missouri residents between May 2016 and January 2019. During the relevant period, Casey was Golden Genesis's majority shareholder, its Chief Executive Officer, Chairman of its Board of Directors, and a signatory on all of Golden Genesis's bank accounts. Casey is domiciled in California.

Dennis Di Ricco began as Golden Genesis's Chief Financial Officer on March 31, 2016; he formally resigned this role in April 2016. However, during the relevant period, Di Ricco remained Golden Genesis's Corporate Secretary, was a member of its Board, and was also a shareholder. Like Casey, Di Ricco was a signatory on Golden Genesis's bank accounts throughout the relevant period. Di Ricco is domiciled in the State of Washington.

In approximately March 2016, Di Ricco introduced Casey and Golden Genesis to Retire Happy, LLC, a Nevada business. Retire Happy secured funding for start-up companies by finding individuals interested in investing funds from their retirement accounts in "alternative investments." During the relevant time,

Retire Happy was operated by Julie Minuskin, its sole managing member and Chief Executive Officer. Minuskin, a Nevada resident, was also a shareholder of Golden Genesis between May 2016 and January 2019.

In April 2016, Golden Genesis entered into a one-page Consulting Agreement with Retire Happy. The Consulting Agreement stated in relevant part:

> 1. Services. [Golden Genesis] hereby authorizes [Retire Happy], on a non-exclusive basis, to identify potential Investors interested in investing in [Golden Genesis's] Promissory Note. [Retire Happy] agrees to identify Six Million Dollars ($6,000,000.00) for [Golden Genesis] within 12 months.
>
> 2. Investor. The investors which [Retire Happy] will introduce to [Golden Genesis] will be named and listed by signed copies of the Promissory Note provided by [Golden Genesis].
>
> 3. Initial Investment. Should an Investor invest in [Golden Genesis's] Promissory Note, then [Golden Genesis] agrees to pay [Retire Happy] twelve percent (12%) of the proceeds invested in [Golden Genesis].
>
> 4. Consultant's fees shall be based upon the gross amount invested, prior to any deductions, expenses or offsets of any kind. Payment will be made by cashier's checks or bank wire payable to the order of [Retire Happy] by the Friday of the week of [Golden Genesis's] receipt of the funds.
>
> 5. Limitation of Services. This agreement relates solely to [Retire Happy's] services as a finder in introducing [Golden Genesis] to prospective investors. There are no additional services that [Retire Happy] is required to perform to be entitled to the above compensation in the event an investment is made.
>
> [RETIRE HAPPY] REPRESENTS THAT IT IS NOT A LICENSED SECURITIES DEALER, AND THAT THIS AGREEMENT IS NOT INTENDED FOR THE PURPOSE OF BUYING, Selling OR TRADING SECURITIES.

Retire Happy provided Golden Genesis and Casey a template promissory note (the "Note") and informed Casey that the language of the document was not to be modified in any fashion; Casey could only select the interval at which the interest on the Notes would be calculated by placing a checkmark next to the appropriate selection.

Retire Happy and Casey developed a ten-page presentation ("Presentation") that Retire Happy later used while making sales pitches to prospective investors. The Presentation claimed that "[p]lasma infusions from young donors have just recently been proven to dramatically repair skeletal, vascular, muscular, major organ and cognitive deterioration associated with aging," and stated that Golden Genesis was "seeking $6 million in financing to develop 6 plasmapheresis centers that will collect blood plasma from donors between the ages of 18 and 25." The Presentation proposed that investors would invest funds in Golden Genesis by providing it with two-year loans, which would earn ten percent simple interest, to be paid at the end of every month. The Presentation stated that

> Notes [would be] secured by a promissory note and a UCC-1 Financing Statement on all assets of Golden Genesis, Inc., including equipment, inventory (together with a rolling, multi-million dollar, 60 – 90 day supply of plasma at each operational facility), receivables, intellectual property, patents, and bank accounts. Copies of the UCC-1 will be sent to the lenders once filed.

The Presentation clearly contemplated that the $6 million in funding which Golden Genesis was seeking would come from multiple, small investors. Thus, the Presentation stated that "[f]unding will be in different amounts and at different dates. Each loan is due two years from the date received by Golden

Genesis, Inc. (GG)." Moreover, the Presentation including a table indicating that investors would be entitled to purchase twelve units of Golden Genesis' plasma at wholesale rates. The table indicated that investors would become eligible for discounts on the wholesale price of plasma, based on the magnitude of their investment. The discounts were tiered in $20,000 increments: thus, an investor lending Golden Genesis between $20,000 and $40,000 would receive a ten percent discount, while an investor investing "$100,000+" would receive a fifty percent discount. The "$100,000+" category was the highest financing increment contemplated in the Presentation.

Provident Trust Group, LLC, is a Nevada business providing custodial and administrative services for self-directed retirement accounts. Golden Genesis's promissory notes were issued exclusively to individuals who had accounts with Provident.

Retire Happy purchased a list of investor leads from a third party, and began contacting leads by telephone and e-mail on behalf of Golden Genesis. In these communications, Retire Happy's staff promoted self-directed Individual Retirement Accounts and 401(k) accounts held by Provident. Retire Happy assisted prospective investors in opening self-directed retirement accounts with Provident, or rolling over existing accounts to Provident. Retire Happy also encouraged prospective investors to invest their retirement funds in "alternative investments" like Golden Genesis' Notes. Retire Happy provided the Presentation to potential investors as part of its sales efforts.

In securing funding for Golden Genesis, Retire Happy performed functions well beyond the limited services contemplated by the Consulting Agreement.

5

Thus, Retire Happy: (1) prepared and supplied the form of Note to be used by potential investors to invest in Golden Genesis; (2) assisted investors to roll over retirement accounts to Provident, in preparation for executing a Note; and (3) controlled the process by which Notes were executed by the parties. Retire Happy staff members would fill in the prospective investor's name, Provident account information, investment amount, and date on the Note, and would then e-mail the form to the investor for execution. Golden Genesis, Casey, and Di Ricco stipulated that, while Casey "personally sign[ed] all of the initial Promissory Notes, . . . to facilitate the execution of future Promissory Notes, Casey authorized Retire Happy to use his Adobe Fill & Sign signature on the Promissory Notes." They also stipulated that "Respondent Casey's electronically affixed signature appears on behalf of [Golden Genesis] on the Promissory Notes o[f] all seven [Missouri Residents or] MRs in this matter." Retire Happy would forward executed Notes to Golden Genesis.

In 2016, four Missouri residents were offered and sold Notes by Retire Happy. Consistent with the Presentation, each Note provided for simple ten-percent interest to be paid monthly, over a term of 24 months.

By October 2017, Golden Genesis had raised more than $6 million from nationwide sales of Notes, but it had not opened a plasmapheresis center or generated any business revenue. Golden Genesis opened its first – and only – plasmapheresis center in San Marcos, Texas, on November 14, 2017. A new "Lending Opportunity Brochure" was prepared to provide updated information. Although the Lending Opportunity Brochure identified Golden Genesis and Retire Happy as the authors on its cover page, and included a signature block for

6

Casey at its conclusion, Casey denied that he had any input in the preparation of the Lending Opportunity Brochure. After its preparation, Retire Happy disseminated the Lending Opportunity Brochure to prospective investors.

The Lending Opportunity Brochure indicated that the first NuPlasma facility had been opened and stated that Golden Genesis was requesting additional funding of $828,000 "[t]o cover additional leasehold expenses and construction costs as well as unexpected expenses due to an extended original timeline as a result of Hurricane Harvey Delays." The Brochure advertised a simple annual interest rate of ten percent, paid monthly, over a 12-month term. Like the Presentation, the Lending Opportunity Brochure provided that the Notes would be "secured by a UCC-1 Financing Statement on all assets of borrower, including, but not limited to, equipment, inventory, receivables, intellectual property, patents, and bank accounts." The Brochure also stated that "[t]he company will exit loan obligations using revenue generated funds from business operations." The Lending Opportunity Brochure was distributed to potential investors from approximately January 2018 to September 2019.

Three Missouri residents were offered and sold a Note through Retire Happy between January 2018 and January 2019. Retire Happy closed its business in February 2020, after raising $9,209,700.00 for Golden Genesis. Golden Genesis paid more than $1,000,000 to Retire Happy and another entity affiliated with Minuskin, in connection with the nationwide sale of Notes between 2016 and 2019.

Golden Genesis communicated with its investors, including the Missouri-resident investors, fourteen times in writing after the last Note was sold to a

7

Missouri resident. Between May and July 2019, Retire Happy notified Casey of inquiries from two Missouri noteholders regarding Golden Genesis's failure to meet its payment obligations on the Notes. At that time, Casey was aware that the investors were domiciled outside Nevada, yet Golden Genesis continued to allow Retire Happy to offer and sell the Notes nationwide.

Golden Genesis made interest payments to Note holders between 2016 and 2019, despite receiving no obvious business revenue from its first, and only, plasmapheresis facility. During that period, Golden Genesis's "income" was derived almost exclusively from the issuance of new Notes. The Commissioner's order found that,

> [t]hroughout the Relevant Period, as Respondents diligently paid interest payments to unsuspecting Note holders, creating the illusion of a viable and financially sound start-up enterprise, Golden Genesis, underneath its manufactured appearance, was at its core a Ponzi scheme, whereby Respondents financed Golden Genesis' debt service on outstanding Notes from proceeds collected from the sale of Notes to new investors.

Di Ricco and Casey withdrew funds from Golden Genesis for their personal use, without permission from, or notice to, investors. In April 2017, Casey withdrew a total of $40,000 from Golden Genesis's bank account as a personal loan to himself for home renovation; the checks to Casey contained a memo line stating "Distribution-Loan to Shareholder." Di Ricco withdrew $2,500,000 from Golden Genesis's account on January 23, 2017, and deposited the funds into another limited liability company he controlled. Two days later, Di Ricco transferred those funds to another limited liability company he owned. Between July and December 2017, $2,700,000 was transferred from the second Di Ricco-controlled entity to Golden Genesis's bank account.

8

The seven Missouri-resident investors received only interest payments. None have received repayment of the principal amount of their loans – which totaled $365,500.

The Notes were not registered or exempt from registration in Missouri. Additionally, Retire Happy and its employees were not registered or exempt from registration to offer and sell securities in Missouri.

Each Note purchased by a Missouri Resident indicated it was secured by a UCC-1 Financing Statement "on all assets of *Holder*, including, but not limited to, equipment, inventory, receivables, intellectual property, patents, and bank accounts." (Emphasis added.) Despite the promises in the Presentation and Lending Opportunity Brochure that Notes would be secured by all of *Golden Genesis*' assets, the "Holders" under the Notes were the investors' retirement accounts themselves. No UCC-1 Financing Statement was ever filed to perfect any security interest securing the Missouri residents' loans.

On August 27, 2020, the Enforcement Section of the Securities Division of the Secretary of State's Office filed a petition for an order to cease and desist and order to show cause why civil penalties, restitution, costs, and other administrative relief should not be imposed by the Commissioner of Securities. After months of discovery, a hearing was held from April 13 to 15, 2021. The parties introduced evidence consisting of live testimony and exhibits, including testimony from Casey, Di Ricco, the case investigator, and five of the seven Missouri investors.

Following the hearing, the Commissioner found that Golden Genesis, Di Ricco, and Casey had violated §§ 409.3-301, 409.4-402(d), and 409.5-501. On

9

May 14, 2021, the Commissioner ordered Golden Genesis, Di Ricco, and Casey to pay statutory penalties for securities violations, restitution with statutory interest, and the actual costs of the investigation and proceedings. The total sum of penalties, costs, and restitution was $1,610,904.55. Golden Genesis, Di Ricco, and Casey appealed the Commissioner's order to the Circuit Court of Cole County. The circuit court upheld the Commissioner's decision.

Golden Genesis, Casey and Di Ricco have now appealed to this Court. Golden Genesis and Casey have filed a joint brief, and we refer to them collectively as "Golden Genesis" except where the context requires greater specificity.

## Discussion

Where an administrative decision was issued after a hearing employing formal "contested-case" procedures,

> [t]his court reviews the decision of the [administrative agency], not that of the circuit court. On appeal from an agency decision in a contested case, we consider only whether the agency's findings are supported by competent and substantial evidence on the record as a whole. We may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses. If the decision of the agency is supported by substantial and competent evidence on the whole record, it must be affirmed. On the other hand, we must reverse the agency's findings if it is determined the decision is not supported by competent and substantial evidence on the whole record, or if the decision constitutes an abuse of discretion, or is unauthorized by law, or is arbitrary and capricious.

*Moses v. Carnahan*, 186 S.W.3d 889, 899 (Mo. App. W.D. 2006) (cleaned up).

10

**I.**

All three appellants argue that Missouri lacks personal jurisdiction over them.

> Personal jurisdiction is a due process requirement limiting the power of courts over litigants. These limits principally protect the liberty of the nonresident defendant – not the convenience of plaintiffs or third parties. When the defendant contests jurisdiction, it is the plaintiff who must shoulder the burden of establishing that defendant's contacts with the forum state were sufficient.

*State ex rel. PPG Indus., Inc. v. McShane*, 560 S.W.3d 888, 891 (Mo. 2018) (cleaned up).

> The Fourteenth Amendment's Due Process Clause bars Missouri courts from exercising personal jurisdiction over a defendant where to do so offends traditional notions of fair play and substantial justice. Accordingly, absent one of the traditional territorial bases of personal jurisdiction – presence, domicile or consent – a court may assert personal jurisdiction over a defendant only if certain minimum contacts between Missouri and the defendant are established.
>
> When evaluating minimum contacts, the focus is on whether there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. This inquiry cannot be simply mechanical or quantitative.
>
> . . . .
>
> . . . [A] court acquires "specific jurisdiction" over an out-of-state defendant when the court exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. In some cases, single or isolated acts by a defendant in a state, because of their nature and quality and the circumstances of their commission, provide specific minimum contacts to support jurisdiction for liability arising from those acts.

*Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232-33 (Mo. 2010) (cleaned up).

"In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "Missouri courts may . . . assert personal jurisdiction over a non-domiciliary defendant corporation without violating due process if that entity has at least one contact with this state ***and*** the cause of action being pursued arises out of that contact." *State ex rel. Key Ins. Co. v. Roldan*, 587 S.W.3d 638, 643 (Mo. 2019) (cleaned up).

"Once it has been established that a defendant has sufficient minimum contacts with the forum state, the court must assess the reasonableness of its assertion of personal jurisdiction over a defendant." *Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216, 233 (Mo. 2015). "Whether the exercise of personal jurisdiction over a defendant with minimum contacts to the forum state is reasonable is based on a consideration of 'the burden on the defendant, the forum's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief.'" *Id.* (citation omitted). None of the appellants argue that the exercise of personal jurisdiction over them would be unreasonable if minimum contacts have been established, and we accordingly need not conduct a separate reasonableness inquiry. *See Strobehn v. Mason*, 397 S.W.3d 487, 503 (Mo. App. W.D. 2013).

We briefly address two additional preliminary points. First, we recognize that the caselaw discussed above directly addresses the personal jurisdiction

which may be exercised by *courts*. The same due-process principles govern personal jurisdiction in *administrative proceedings* like the litigation before the Commissioner. *See Travelers Health Ass'n v. Commonwealth of Va.*, 339 U.S. 643, 647 (1950) (applying "minimum contacts" analysis to proceeding before State Corporation Commission concerning alleged marketing of unregistered securities); *Bulldog Investors Gen. P'ship v. Sec'y of Commonwealth*, 929 N.E.2d 293, 300-01 (Mass. 2010) (proceeding before Secretary of the Commonwealth under the Uniform Securities Act alleging sale of unregistered securities); *Cavers v. Houston McLane Co.*, 958 A.2d 905, 909-10 (Me. 2008); *Leewaye v. Indus. Claim Appeals Off.*, 178 P.3d 1254, 1257 (Colo. App. 2007); *In re Blue Flame Energy Corp.*, 871 N.E.2d 1227, 1237 (Ohio App. 2006); *Covia v. Robinson*, 507 N.W.2d 411, 415 (Iowa 1993).

Second, we note that in their briefs both Golden Genesis and the Commissioner discuss Missouri's "long-arm" statute, § 506.500. That statute governs only "the jurisdiction of *the courts* of this state," however. §§ 506.500.1, .2 (emphasis added). As Di Ricco points out, "an administrative agency is not a court." *Bridges v. State Bd. of Registration for Healing Arts*, 419 S.W.2d 278, 281 (Mo. App. 1967); *see also, e.g., Cass Cnty. v. Dir. of Revenue*, 550 S.W.3d 70, 74 (Mo. 2018) ("'[A]n administrative body or even a quasi-judicial body is not and cannot be a court in a Constitutional sense.'" (citation omitted)). Because it only specifies "the jurisdiction of the courts of this state," § 506.500 does not govern the exercise of jurisdiction by Missouri administrative agencies. *See Bulldog Investors*, 929 N.E.2d at 299 ("By its terms, the [Massachusetts] long-arm statute applies only to courts and cannot authorize an agency to exercise

personal jurisdiction over nonresidents."); *Blue Flame Energy*, 871 N.E.2d at 1236 (same holding with respect to Ohio long-arm statute). Neither Golden Genesis nor Di Ricco cite to any <u>other</u> statutory limitation on the Commissioner's regulatory jurisdiction, apart from their contention that the Notes do not constitute "securities" subject to the Missouri Securities Act of 2003 – an argument we reject in § II, below.

**A.**

We first address whether the Commission had personal jurisdiction over Golden Genesis. The company contends that personal jurisdiction was lacking because it did not have any relevant contacts with Missouri. Golden Genesis also argues that Retire Happy was not its agent, and Retire Happy's contacts with Missouri residents therefore cannot be attributed to Golden Genesis.

The evidence before the Commissioner supports the conclusion that Retire Happy was acting as a broker for Golden Genesis' debt instruments. As we only recently explained:

> A "broker" has been defined as a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation for compensation commonly called "brokerage." A brokerage contract is a kind of agency contract under which a broker is employed to make contracts of the kind agreed upon in the name and on behalf of the broker's principal and for which the broker is paid an agreed commission.
>
> . . . .
>
> Two elements must be met to find that one is acting as a "broker": the person must act for compensation, and the person must act on behalf of someone else. . . . Title to property usually does not pass through a broker, nor does a broker deal on its own account, although by contract a broker

14

> may have title to property pass through it or may collect from a consumer.

As stated in *St. Paul Fire & Marine Ins. Co. v. Wedgewood Realty, Inc.*, 639 S.W.2d 233 (Mo. App. E.D. 1982):

> "As generally defined, a broker is an *agent* who, for a commission or brokerage fee, bargains or carries on negotiations *on behalf of his principal* as an intermediary between the latter and third persons in transacting business relative to . . . the sale or purchase of any form of property, real or personal. . . . Brokers have also been defined as those who are engaged with others in the negotiation of contracts relative to property, with the custody of which they have no concern."

*Id.* at 234 (citation omitted).

*State ex rel. DKM Enters., LLC v. Lett*, 675 S.W.3d 687, 699 (Mo. App. W.D. 2023) (other citations omitted).

Golden Genesis permitted, and enabled, Retire Happy to execute binding agreements on Golden Genesis' behalf, on approved terms, for an agreed compensation. It is undisputed that the Consulting Agreement only authorized Retire Happy to "identify potential investors interested in investing in the [Golden Genesis] Promissory Note." However, over a multi-year course of dealings and with Golden Genesis' full knowledge and participation, Retire Happy acted well beyond the limited "finder" role contemplated by the Consulting Agreement. Thus, as the Commissioner found, Retire Happy staff "supplied the Note document used in the transaction, assisted investors with rolling over their retirement accounts to Provident in preparation for the Note investment, and controlled most of the transactional process with respect to the execution of the Notes." Golden Genesis stipulated that Casey authorized Retire Happy to execute Notes on behalf of Golden Genesis by affixing his electronic

15

signature to the Notes. These electronic signatures appear on each of the Notes executed by the Missouri-resident investors.

Despite claims to the contrary, Golden Genesis knew that Retire Happy was performing these functions, and knowingly permitted it to continue doing so. Retire Happy repeatedly forwarded fully executed Notes to Golden Genesis, and provided it with the name and e-mail address of each new investor. Golden Genesis did not reject the Notes Retire Happy executed on its behalf, or ask Retire Happy to stop executing Notes. On the contrary, Golden Genesis accepted the funds generated by the executed Notes, and began regular communication with the new investors.

Although Golden Genesis contends that it was unaware that Retire Happy was executing Notes with Missouri residents, its actions show that it consented to Retire Happy executing Notes nationwide. Golden Genesis did not restrict where Retire Happy could solicit investors, and there is no evidence in the record that Golden Genesis questioned where Retire Happy was advertising and executing Notes, even after receiving information concerning new investors. Casey himself testified that he was aware that the investors were "all over the country."

There is no dispute that third-party investors, like the Missouri residents, had a reasonable, good-faith belief that Retire Happy had the authority to act on Golden Genesis's behalf. Retire Happy assisted the Missouri investors in setting up Provident accounts and executing the Notes, each of which contained the signature of Casey on behalf of Golden Genesis. The Missouri investors had no reason to believe Retire Happy lacked the authority to execute the Notes on Golden Genesis's behalf.

16

Since it acted as a broker for Golden Genesis' debt instruments, Retire Happy's actions marketing to, and transacting business with, Missouri residents are properly imputed to Golden Genesis for jurisdictional purposes. "A corporation can act only through its agents." *State ex rel. Cedar Crest Apartments, LLC v. Grate*, 577 S.W.3d 490, 495 (Mo. 2019). "As a result, a personal jurisdiction analysis will involve (though, usually, only implicitly) imputing the contacts of a defendant corporation's agent(s) to that corporation." *Id.* "A principal is liable vicariously for his agent's acts if the principal manifests his consent to, or knowingly permits, the agent's exercise of authority, and if the third party believed, with a reasonable, good faith basis for doing so, that the agent had authority and relied on the agent's apparently having authority to act." *Premium Fin. Specialists, Inc v. Hullin*, 90 S.W.3d 110, 113 (Mo. App. W.D. 2002).

Personal jurisdiction is also justified based on the fact that marketing materials prepared by Casey were used to persuade the Missouri investors to execute Notes. It is undisputed that Casey prepared a sales Presentation that Retire Happy provided to prospective investors, including the Missouri residents. Casey testified that he intended the Presentation to be provided only to Provident, for it to determine whether Golden Genesis' notes qualified as appropriate investments to be held by Provident's account-holders. The Commissioner evidently did not find this testimony to be persuasive, however. The content of the Presentation itself plainly contemplated small, separate loans by individual investors, and the Presentation explained the interest rate and other benefits those individual, small investors would receive. Based on the

17

content of the Presentation, it was a reasonable inference that the Presentation was prepared by Casey to be used exactly as Retire Happy used it: to market Notes to individual investors, in Missouri and elsewhere.

Beyond Retire Happy's sales efforts, and the use of the Presentation prepared by Casey in marketing to Missouri residents, it is also significant that Golden Genesis directly entered into written contracts with each of the Missouri residents. The execution of a contract with a Missouri resident may not, on its own, "automatically establish minimum contacts with Missouri." *Andra*, 453 S.W.3d at 230 n.10. But in this case, the contracts which Golden Genesis entered contemplated an ongoing, one- or two-year relationship. "[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (citations omitted); *see also Andra*, 453 S.W.3d at 230 (where "the terms of the contract . . . establish[ ] . . . a continuing relationship" between an out-of-state entity and a Missouri resident, the creation of that contractual relationship can support personal jurisdiction). Further, as part of their ongoing contractual relationship, Golden Genesis sent fourteen written communications to the Missouri investors concerning the company's ongoing operations and future prospects.

We reject Golden Genesis's contention that the Commissioner lacked personal jurisdiction over it.

**B.**

Casey argues that, even if personal jurisdiction exists over Golden Genesis, _he_ is not subject to personal jurisdiction, because he and the corporation are separate legal entities, and Golden Genesis' acts should not be imputed to him.

The Commissioner does not contend that Golden Genesis' separate corporate identity should be disregarded on a "veil-piercing" theory, and that Golden Genesis' actions should be imputed to Casey on that basis. Even without invoking the piercing-the-corporate-veil doctrine, however, Missouri law holds that a corporate officer like Casey can be liable for his own involvement in wrongful acts, even if those wrongful acts were undertaken in the officer's corporate capacity.

> While it is generally true that merely holding a corporate office will not subject one to personal liability for the misdeeds of the corporation, under Missouri law, an officer of a corporation may be held liable for the tortious acts of the corporation if the officer had actual or constructive knowledge of the wrongful acts and participated in or approved of those wrongful acts.

_In re Lomantini_, 252 B.R. 469, 476 (Bankr. E.D. Mo. 2000) (citing _Grothe v. Helterbrand_, 946 S.W.2d 301, 304 (Mo. App. S.D. 1997)). In other words, "[a] corporate officer may be held liable if it is shown by evidence of probative force that he had actual or constructive knowledge of the actionable wrong and participated therein." _Rogers v. Super. Metal, Inc._, 480 S.W.3d 480, 483 (Mo. App. S. D. 2016) (cleaned up).

A similar principle applies to personal jurisdiction: a corporate officer can be subject to jurisdiction in a forum based on actions the officer personally took in the forum, even if those actions were taken in the officer's corporate capacity. As a recent federal decision explains:

19

With respect to the Due Process Clause, the Supreme Court has twice held that minimum contacts analysis considers actions taken by individuals in their role as corporate employees or officers.

First, in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), a California entertainer brought a libel action in California Superior Court over the publication of an article in the National Enquirer, *id.* at 785, 788, 104 S.Ct. 1482. She sued, among others, the Florida-based National Enquirer and two of its Florida-based employees who authored and edited the article. *Id.* at 785, 789, 104 S.Ct. 1482. . . .

In holding that personal jurisdiction was proper over the individual employees, the Supreme Court acknowledged that the offending article was actually published by their corporate employer. *Calder*, 465 U.S. at 789–790, 104 S.Ct. 1482. But, the Court emphasized, "their status as employees does not somehow insulate them from jurisdiction." *Id.* at 790, 104 S.Ct. 1482. "Each defendant's contacts with the forum State must be assessed individually." *Id.* To be sure, the employees' "contacts with California are not to be judged according to their *employer's* activities there." *Id.* (emphasis added). But that did not absolve the employees of the jurisdictional consequences of their own individual actions as employees that reached into the forum state. Because they were "primary participants in an alleged wrongdoing intentionally directed at a California resident," the Supreme Court held that the exercise of personal "jurisdiction over them [wa]s proper[,]" notwithstanding that they undertook those actions in their role as employees. *Id.* at 789–790, 104 S.Ct. 1482.

Second, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), a New York resident brought a libel suit in the United States District Court for the District of New Hampshire against Hustler Magazine and Larry Flynt, its publisher, editor, and owner, *id.* at 781 n.13, 104 S.Ct. 1473. In addressing personal jurisdiction, the Supreme Court reaffirmed that jurisdiction over Flynt turned not upon the jurisdictionally relevant actions of the business, but upon Flynt's individual contacts, professionally or otherwise, with the forum. *Id.* The Court rejected the notion that "employees who act in their official capacity are somehow shielded from suit in their individual capacity[,]" repeating *Calder*'s

20

admonition that "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.*

. . . .

Following the Supreme Court's lead, we hold that, when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer. Contacts are contacts and must be counted.

*Urquhart-Bradley v. Mobley*, 964 F.3d 36, 45–46 (D.C. Cir. 2020) (cleaned up); *see also, e.g.*, *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1109-10 (9th Cir. 2020); *Newsome v. Gallacher*, 722 F.3d 1257, 1275-77 (10th Cir. 2013).

Casey personally engaged in actions directed at Missouri which justify the Commissioner's exercise of personal jurisdiction over him. Casey was the majority shareholder, Chief Executive Officer, and Chairman of the Board of Golden Genesis during the relevant period. Moreover, Casey was personally involved in the misconduct which underlies this enforcement proceeding. Thus, he personally executed the Consulting Agreement with Retire Happy, which authorized Retire Happy to seek investors willing to lend money to Golden Genesis by means of the Notes. The Consulting Agreement itself contains a representation from Retire Happy "THAT IT IS NOT A LICENSED SECURITIES DEALER, AND THAT THIS AGREEMENT IS NOT INTENDED FOR THE PURPOSE OF BUYING, Selling OR TRADING SECURITIES" – reflecting Casey's knowledge that he was authorizing the sale of unregistered securities by an unregistered agent.

Casey reviewed and added information to the form of Note which Retire Happy marketed to prospective investors. He also prepared the Presentation which Retire Happy used to promote Notes to investors – including the Missouri-resident investors. The Commissioner found that the Presentation "was festooned with stock photos, emblems of prominent universities that bore no discernable affiliation with Golden Genesis, unsubstantiated claims, [and] arithmetic inconsistencies." The Commissioner also found that the Presentation promised that Notes would be secured by "all assets of Golden Genesis, Inc." – a promise which the Notes themselves failed to fulfill.

Casey stipulated that he "personally sign[ed] all of the initial Promissory Notes, but to facilitate the execution of future Promissory Notes, [he] authorized Retire Happy to use his Adobe Fill & Sign signature on the Promissory Notes." Thus, Casey personally gave Retire Happy the means to enter binding Notes with prospective investors, including each of the Missouri-resident investors (whose Notes all bore Casey's electronic signature, inserted by Retire Happy). Casey also personally corresponded with lenders – including the Missouri-resident lenders – to update them on Golden Genesis' operations and financial performance. In addition, Casey personally communicated with two Missouri-resident lenders who expressed concerns when Golden Genesis suspended interest payments.

These facts establish that Casey directly participated in the acts which underlie the Commissioner's claims of violations of the Missouri Securities Act of 2003. Casey's actions provide the minimum contacts with Missouri necessary to establish specific personal jurisdiction over him.

## C.

We reach a different conclusion with respect to the other individual named as a respondent in the action before the Commissioner: Dennis Di Ricco. Although Di Ricco was a corporate officer and shareholder of Golden Genesis at the relevant times, there is no evidence that Di Ricco was involved in the drafting or approval of the form of the Notes, or in the preparation of the promotional materials used to market the Notes. Moreover, Di Ricco was not involved in the execution of the Notes, and there is no indication that he was involved in communication with investors following the Notes' execution.

To establish personal jurisdiction over Di Ricco, the Commissioner emphasizes that Di Ricco is the one who introduced Casey and Golden Genesis to Retire Happy. While that may be true, simply arranging an introduction between two business entities cannot, without more, make Di Ricco responsible for the subsequent business dealings in which those entities engaged. The fact that Retire Happy had previously marketed promissory notes for other businesses with which Di Ricco was affiliated likewise does nothing to establish that Di Ricco authorized Retire Happy to act on his behalf with respect to the Golden Genesis Notes, or otherwise demonstrates that he had sufficient contacts with Missouri to warrant jurisdiction over him.

The Commissioner also relies on the evidence that Di Ricco transferred Golden Genesis funds to other entities in which he held a controlling interest. The Commissioner emphasizes that the funds Di Ricco appropriated came from Golden Genesis' lenders, including the Missouri-resident investors. But the fact that funds Di Ricco appropriated may have had their origin, in part, in Missouri cannot by itself establish personal jurisdiction over him in Missouri. "[M]ere

injury to a forum resident is not a sufficient connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). Thus, in *Walden*, the Supreme Court held that a Georgia police officer was not subject to suit in Nevada. In *Walden*, the officer seized cash at the Atlanta airport belonging to Nevada residents who were traveling home to Nevada. Even assuming that the Nevada residents experienced financial injury in Nevada, the Supreme Court held that they had failed to establish personal jurisdiction over the Georgia police officer. *Id.* A similar analysis applies here: even though Missouri-resident investors may have experienced financial injury in Missouri due to Di Ricco's appropriation of Golden Genesis funds, Di Ricco's actions did not occur in, and were not purposefully directed at, Missouri. "[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 285.

In his Brief, the Commissioner also highlights evidence concerning bankruptcy proceedings in which Di Ricco was involved, an administrative cease and desist order issued against Di Ricco in another State for securities-law violations, and Di Ricco's criminal convictions. Di Ricco's financial standing, criminal history, and unrelated misconduct in another State, are irrelevant to Missouri's power to adjudicate his rights here.

The Commissioner has failed to establish that Di Ricco had contacts with Missouri sufficient to support the exercise of personal jurisdiction over him. We therefore reverse that portion of the circuit court's judgment which refused to set

aside the Commissioner's order imposing liability on Di Ricco for restitution, penalties, and costs.

## II.

Golden Genesis also argues that the Commissioner lacked subject matter jurisdiction over transactions involving the Notes, because the Notes are not "securities" within the meaning of the Missouri Securities Act of 2003. We disagree.

"[T]he ultimate question of whether an instrument is a security is 'a question of law and not of fact.'" *Secs. & Exch. Comm'n v. Thompson*, 732 F.3d 1151, 1160 (10th Cir. 2013) (collecting cases).

> Although we are not bound by the interpretation of the agency as to questions of law or the application of law to undisputed facts, Missouri courts have traditionally attempted to construe the Act consistent with the interpretation given . . . by the Missouri Commissioner of Securities. Accordingly, the Commissioner's interpretation should be sustained unless it is unreasonable or arbitrary. Therefore, we review the Commissioner's construction of the statutes and rules at issue here to determine whether the [Commissioner's] interpretation, whether by regulation or otherwise, is reasonable, in light of the language, policies, and legislative history of the Act.

*Moses v. Carnahan*, 186 S.W.3d 889, 899 (Mo. App. W.D. 2006) (cleaned up).

The Securities Act defines a "security," in relevant part, as follows:

> **"Security"** means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness . . . investment contract; . . . or, in general, an interest or instrument commonly known as a "security" . . . .

§ 409.1-102(28).

"The Missouri Securities Act of 2003 is patterned after the Uniform Securities Act." *Brady v. Ashcroft*, 643 S.W.3d 565, 574 (Mo. App. W.D. 2022) (interpreting the Missouri Securities Act of 2003 by reference to the Uniform Securities Act and comments thereto). Official Comment 28 to § 102 of the Uniform Securities Act explains that "[m]uch of the definition" of a "security" in the Act "is identical to the definition in Section 2(a)(1) of the [federal] Securities Act [of 1933]," 15 U.S.C. § 77b(a)(1). Official Comment 28 also notes that "State courts interpreting the Uniform Securities Act definition of security have often looked to interpretations of the federal definition of security."

In interpreting the definition of a "security" in the federal securities laws, the Supreme Court of the United States has emphasized that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). "In line with Congress's broad regulatory aims, courts inquiring into an instrument's status as a 'security' are not 'bound by legal formalisms,' but instead must 'take account of the economics of the transaction under investigation' . . . ." *Thompson*, 732 F.3d at 1158 (quoting *Reves*, 494 U.S. at 61).

While the federal securities laws explicitly define a "security" to include a "any note," *Reves* held that "the phrase 'any note' should not be interpreted to mean literally 'any note.'" 494 U.S. at 63. *Reves* held that many common types of notes were properly excluded from the coverage of the federal securities laws:

> [T]ypes of notes that are not "securities" include the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer,

26

short-term notes secured by an assignment of accounts receivable,
. . . a note which simply formalizes an open-account debt incurred in
the ordinary course of business[,] . . . [and] notes evidencing loans
by commercial banks for current operations[.]

*Reves*, 494 U.S. at 65 (cleaned up).

*Reves* held that this list of excluded "notes" was not exhaustive. The Court held that "[a] note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of instrument." *Id.* at 67. "If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors." *Id.*

*Reves* adopted the "family resemblance" test to determine whether a note should be considered a "security." The "family resemblance" test requires the analysis of four factors:

<u>First</u>, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." <u>Second</u>, we examine the "plan of distribution" of the instrument, to determine whether it is an instrument in which there is common trading for speculation or investment. <u>Third</u>, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. <u>Finally</u>, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the

27

risk of the instrument, thereby rendering application of the
Securities Acts unnecessary.

494 U.S. at 66-67 (cleaned up; emphasis added).

While no prior Missouri case has expressly adopted the *Reves*' "family

resemblance" test to determine whether a note is a "security," courts in multiple

other States have applies *Reves* to define a "security" under the Uniform

Securities Act. *See*, *e.g.*, *LA Developers, LLC v. Dep't of Licensing & Reg. Affs.*,

No. 358656, 2023 WL 3555079, at *9-*10 (Mich. App. May 18, 2023); *Thompson

v. People*, 471 P.3d 1045, 1054 (Colo. 2020) ("the clear trend among state courts

around the country is to adopt the family resemblance test for determining

whether a note is a security for purposes of their state securities acts"; collecting

cases); *NTV Mgmt., Inc. v. Lightship Glob. Ventures, LLC*, 140 N.E.3d 436, 444-

45 (Mass. 2020); *State v. J.R.B.*, 239 P.3d 1052, 1055-58 (Utah App. 2010).  We

also note that § 409.6-608(b) provides that,

> in acting by . . . order . . . under this act, the commissioner shall, in
> the discretion of the commissioner, take into consideration in
> carrying out the public interest the following general policies:
>
> > . . . .
>
> > (2)     [m]aximizing uniformity in federal and state regulatory
> standards . . . .

Under *Reves*' first factor, a note is likely to be a "security" where "the

seller's purpose is to raise money for the general use of a business enterprise or to

finance substantial investments and the buyer is interested primarily in the profit

the note is expected to generate."  494 U.S. at 66.  Here, it is undisputed that

investors were interested in receiving profits from their investment in Golden

Genesis.  Notably, the Consulting Agreement between Golden Genesis and Retire

28

Happy charged Retire Happy with the task of "identify[ing] *potential Investors* interested in *investing* in [Golden Genesis's] Promissory Note." (Emphasis added.) The Consulting Agreement itself recognizes that the persons advancing funds to Golden Genesis were looking to make *investments*, not to engage in routine commercial or construction lending. For its part, Golden Genesis's motivation was to generate start-up funding to enable the build-out of the company's planned network of plasmapheresis centers. The notes were not intended to finance any consumer transaction, or fulfill any short-term commercial need. The first *Reves* factor weighs in favor of treating the Notes as "securities."

*Reves*' second factor looks to "the plan of distribution" for the Notes. As one Court has explained, "[i]f notes are sold to a wide range of unsophisticated people, as opposed to a handful of institutional investors, the notes are more likely to be securities." *United States Securities & Exch. Comm'n v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) (citation omitted). In *Reves*, the Court found that a borrower had engaged in "common trading" where its notes "were not traded on an exchange," but were "offered and sold to a broad segment of the public." 494 U.S at 68. The notes in *Reves* were offered to over 23,000 members of an agricultural cooperative as well as an unknown number of nonmembers; more than 1,600 notes were held by investors when the cooperative filed for bankruptcy. *Id.* at 58-59.

Here, the Notes were offered to an unknown number of potential investors nationwide through Retire Happy, and ultimately were sold to 240 investors across the United States. The number of investors to whom Notes were sold is

comparable to the number sold in other cases finding a plan of "common trading." *See*, *e.g.*, *Sec. & Exch. Comm'n v. Thompson*, 732 F.3d 1151 (10th Cir. 2013) (issuer made its notes available to anyone willing to pay and sold the notes to 60 people); *Sec. and Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309 (S.D. Fla. 2021) (notes were sold to 488 investors in at least a dozen states, and the company had a finder's agreement to solicit investors). Moreover, none of the Notes executed by the Missouri residents exceeded $100,000. While the amounts loaned were undoubtedly significant to the individual investors, this is plainly not a case in which Notes were sold only to "a handful of institutional investors." *Zada*, 787 F.3d at 381. The second factor likewise weighs in favor of finding that the Notes are "securities."

The third factor, the public's reasonable perceptions, is considered to be a "one-way ratchet." *Stoiber v. Secs. & Exch. Comm'n*, 161 F.3d 745, 751 (D.C. Cir. 1998). The third factor "allows notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are. It does not, however, allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." *Id.*

Golden Genesis and Casey contend that a reasonable person would not expect the Notes to be a regulated security because "the notes specifically state a fixed payout of ten percent simple interest, with no conversion to equity option." We disagree. Other courts have found that even when notes have fixed interest rates, the public may reasonably expect that their investments are securities. *See Roer v. Oxbridge Inc.*, 198 F. Supp. 2d 212, 225 (E.D.N.Y. 2001) ("any argument

that the fixed interest rates provided by the URI Note and Firestorm notes preclude the finding of a 'security' has been flatly rejected by the Second Circuit," citing *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 814 (2nd Cir. 1994)). Further, in promoting the Notes to potential investors, Retire Happy referred to the Notes as "alternative investments" to be held within "self-directed IRAs" and "solo 401k retirement accounts." The public's expectation – fostered by Retire Happy's marketing – was to earn a profit through investing. The third factor weighs in favor of finding that the Notes are "securities."

Finally, no alternative "regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act[ ] unnecessary." *Reves*, 494 U.S. at 67. Golden Genesis argues that, because the notes are secured by collateral, Article 9 of the Uniform Commercial Code provided investors with adequate protection. We disagree that the Notes were secured by any security interest. Although the Presentation and the Lending Opportunity Brochure promised that the Notes would be secured by all of *Golden Genesis*' assets, the Notes as written were secured only by the assets of the Notes' "Holder" – namely, the investors' retirement accounts themselves. Thus, there was no meaningful security offered for the Notes; nor was any UCC-1 Financing Statement ever filed to perfect any purported security interest. Thus, the reality is that the Notes were essentially unsecured, just like the "uncollateralized and uninsured" notes in *Reves*. 494 U.S. at 69. The fourth factor weighs in favor of finding that the Notes are "securities."

We hold that the Notes are "securities" within the meaning of the Missouri Securities Act of 2003; accordingly, the Commissioner had subject-matter jurisdiction over Golden Genesis' marketing of the Notes.

## Conclusion

For the foregoing reasons, we affirm the judgment of the circuit court, to the extent that it upheld the Commissioner's order imposing liability on Golden Genesis and Casey. The circuit court's judgment is reversed to the extent that it upheld the order's imposition of liability on Di Ricco. Pursuant to Rule 84.14, we "give such judgment as the [circuit] court ought to give," and modify the circuit court's judgment to set aside the Commissioner's order imposing penalties, restitution, and costs on Di Ricco.

_____
Alok Ahuja, Judge

All concur.